## CHECK INFORMATION

| LEVETT | LEVETT ROCKWOOD P.C. | | | DATE 7/9/2009 | | CHECK NO. 7550 |

| | | | | | | |
|---|---|---|---|---|---|---|
| RETAINER | 5/22/2009 | | 2023133 | Levett Rockwood P.C. | | 10,000.00 |

VENDOR: LEVETT    LEVETT ROCKWOOD P.C.
General Maritime Subsidiary Co
299 Park Avenue   New York, NY 10171

TOTAL $   10,000.00

4080944801



| | | |
|---|---|---|
| RETURN DATE: | : | SUPERIOR COURT |
| | : | |
| | : | JUDICIAL DISTRICT |
| GENERAL MARITIME CORPORATION | : | OF ANSONIA-MILFORD |
| | : | AT MILFORD |
| v. | : | |
| | : | |
| AIRCRAFT GUARANTY TITLE & TRUST, | : | |
| LLC, in its capacity as TRUSTEE | : | |
| of CONTINENT AIRCRAFT TRUST | : | |
| NO. 461, and CONTINENT AIRCRAFT | : | |
| TRUST NO. 461 | : | JUNE ____, 2009 |

### AFFIDAVIT OF JAMES A. CALABRESE IN SUPPORT OF PLAINTIFF'S APPLICATIONS FOR PREJUDGMENT REMEDY AND *EX PARTE* PRELIMINARY INJUNCTION

COMMONWEALTH OF MASSACHUSETTS )
                              ) ss:  Weymouth
COUNTY OF NORFOLK             )

   Personally appeared James A. Calabrese, who being first duly sworn, deposes and says:

   1.   I am over the age of 18 and believe in the obligations of an oath.

   2.   The information contained herein is based upon my own personal knowledge and belief.

   3.   This Affidavit is submitted in support of the Plaintiff's Applications for Prejudgment Remedy and *Ex Parte* Preliminary Injunction dated June 13, 2009.

4.    Until April 17,2009 I served as the Director of Maintenance at JetDirect Aviation, 97 Libbey Parkway, Weymouth, MA  02188 ("JDA"), a private jet services company that provided aircraft management, aviation, and charter services.

5.    JDA managed and operated Dassault Falcon 2000EX, serial number 15, FAA registration mark N97GM (formerly N215EX), including its two (2) Pratt & Whitney PW 308C engines, serial numbers PCE-CF0042 and PCE-CF0025 (collectively the "Aircraft") under certificate number AJCA091C from February 5, 2004 until February 5, 2009.  During that time, the Aircraft was maintained in accordance with the manufacturers' requirements and JDA's General Maintenance Manual.

6.    In order for the Aircraft to be approved for charter service under JDA's Air Carrier certificate, JDA developed and adopted a Continuous Airworthiness Maintenance Program to provide comprehensive Inspection Tasks and Instructions that comply with FAA Federal Air Regulations FAR 91.409(f) and 43.13.  JDA was authorized to use this program by the FAA by Operations Specification D072 and by FAR 135.419(g).

-2-

7.    Under this program, all Airworthiness Directives and
Mandatory Service Bulletins have been complied with and all service
records maintained at home base and with JDA Maintenance Control Dept.
JDA and the responsible party in charge of the Aircraft have used the
most current revision of the F2000EX Aircraft Maintenance Manual
("AMM"), the Pratt & Whitney Canada PW308C Engine Maintenance Manual
and the Allied Signal GTCP 36-150 series auxiliary power unit ("APU")
Maintenance Manual.  Time control of the Falcon 2000EX Inspection
system, Engines, Components, Airworthiness Directives, and Service
Bulletins were tracked by the Computerized Aircraft Maintenance
Program ("CAMP") system, which provides a detailed and comprehensive
readout for each calendar month.

8.    The Aircraft has been maintained at all times in accordance
with all applicable FAA regulations and the manufacturers' recommended
maintenance and inspection programs, including (i) all procedures
required to remain in compliance with CAMP; (ii) all repairs,
inspections and maintenance required by the Manufacturer's Recommended
Maintenance Program delineated in Chapter 5 of the Falcon Maintenance
Manual; (iii) performance of Manufacturer's Recommended Inspections,
Chapter 5A. and B. inspections; and (iv) FAA Airworthiness Directives,

-3-

mandatory service bulletins, service instructions, or any other mandatory maintenance or operational publications of the manufacturer of the Aircraft, engines, APU and/or accessories.

9.   Further, to the best of my knowledge, the Aircraft has not been involved in any incident or accident and has not incurred any damage to the Aircraft or any part thereof that required (i) the issuance of an FAA Form 337; or (ii) an alteration or repair which would constitute a "major repair" as such term is defined in 14 C.F.R., Part 43, Appendix A and/or recorded in a manner prescribed by 14 C.F.R., Part 43, Appendix B, or otherwise in the log books or records of the Aircraft or in an insurance claim or otherwise; or (iii) any deviation from the approved manufacturer's aircraft build specifications or standard production configuration.

10.   The Aircraft was at all times maintained in a fully operational, duly certified and airworthy condition.  The Aircraft was returned in the condition it was required to be maintained, along with all logs and records that were required to be maintained with the Aircraft under applicable FAA regulations.

11.   In summary, the Aircraft was operated and maintained under all guidelines set forth by JDA, and JDA complied with all rules and

-4-

regulations with respect to aircraft airworthiness and FAA compliance in the course of operating and maintaining the Aircraft.

_____
James A. Calabrese

    Subscribed and sworn to before me on this the _06_ day of July, 2009.

_____
Notary Public
My Commission Expires: 11/24/2011

-5-

| | | |
|---|---|---|
| RETURN DATE: | : | SUPERIOR COURT |
| | : | |
| | : | JUDICIAL DISTRICT |
| GENERAL MARITIME CORPORATION | : | OF ANSONIA-MILFORD |
| | : | AT MILFORD |
| v. | : | |
| | : | |
| AIRCRAFT GUARANTY TITLE & TRUST, | : | |
| LLC, in its capacity as TRUSTEE | : | |
| of CONTINENT AIRCRAFT TRUST | : | |
| NO. 461, and CONTINENT AIRCRAFT | : | |
| TRUST NO. 461 | : | JULY ____, 2009 |

### AFFIDAVIT OF JOHN GEORGIOPOULOS IN SUPPORT OF PLAINTIFF'S APPLICATIONS FOR PREJUDGMENT REMEDY AND EX PARTY PRELIMINARY INJUNCTION

STATE OF NEW YORK              )
                              ) ss: Manhattan
COUNTY OF NEW YORK            )

Personally appeared John Georgiopoulos, who being first duly sworn deposes and says:

1.   I am over the age of 18 and believe in the obligations of an oath.

2.   The information contained herein is based upon my own personal knowledge and belief.

3.   This Affidavit is submitted in support of the Plaintiff's Applications for Prejudgment Remedy and *Ex Parte* Preliminary Injunction dated July 13, 2009.

4.    I currently serve as the Executive Vice President of the Plaintiff, General Maritime Corporation.

5.    On or about February 5, 2004, the Plaintiff as Lessee and the Defendant Continent Aircraft Trust No. 461 (the "Trust") as Lessor entered into an Aircraft Lease Agreement (the "Lease Agreement").  My brother, Peter C. Georgiopoulos, executed the Lease Agreement in his capacity as Chairman and Chief Executive Officer of Plaintiff.  The Defendant Aircraft Guaranty Title & Trust, LLC ("Aircraft Title & Trust") executed the Lease Agreement in its capacity as Trustee of the Trust, with Dr. Connie L. Wood acting as signatory for the Trustee.  A copy of the Lease Agreement is attached hereto as Exhibit A.

6.    Pursuant to Sections 1 and 2 of the Lease Agreement, Plaintiff leased that certain Dassault Falcon 2000EX, serial number 15, FAA registration mark N215EX, including its two (2) Pratt & Whitney PW 308C engines, serial numbers PCE-CF0042 and PCE-CF0025, together with all parts, additions, accessories, and components installed thereon, and including all radios, avionics and additional equipment appurtenant thereto, and all available log books, manuals, maintenance records and technical records (the "Aircraft") from the Trust for a term of five (5) years commencing on February 5, 2004 and

-2-

expiring on February 5, 2009.  On or about March 11, 2005, Plaintiff caused the FAA registration mark to be updated from N215EX to N97GM. As used herein, the defined term "Aircraft" encompasses both of the foregoing FAA registration marks.

7.   I understand that an entity known as Aircraft Guaranty Financial Corporation, as grantor, appointed Aircraft Title & Trust as Trustee of the Trust, and that Aircraft Guaranty Financial Corporation and/or Aircraft Title & Trust subsequently caused the Aircraft to be contributed as Trust Property to the Trust.  To my knowledge, the Trust holds no assets other than the Aircraft and the Security Deposit (defined below) whose return Plaintiff seeks in this action.

8.   A copy of the Aircraft's registration certificate, pursuant to which Aircraft Title & Trust as Trustee is listed as the registered owner of the Aircraft, is attached hereto as Exhibit B.

9.   Pursuant to Section 4 of the Lease Agreement, the Plaintiff paid the Trust the amount of $125,000 per month as rent.

10.   Pursuant to Section 5 of the Lease Agreement, the Plaintiff was required to base the Aircraft at the Waterbury-Oxford Airport in Oxford, Connecticut (the "Airport"), and I believe the Aircraft is

-3-

presently located at 9 Juliano Drive, Hangar G, at the Waterbury-Oxford Airport.

11.  Pursuant to Section 6 of the Lease Agreement, the Plaintiff was required to return the Aircraft to the Trust at the Airport upon expiration of the Lease.

12.  Pursuant to Section 18 of the Lease Agreement, upon execution of the Lease Agreement, the Plaintiff deposited with the Trust the sum of $1,000,000, to be held by the Trust as security for Plaintiff's performance of its obligations under the Lease Agreement (the "Security Deposit").  The Defendants have never disclosed the location of the Security Deposit to the Plaintiff, and the Plaintiff does not know where it is located.

13.  Further pursuant to Section 18 of the Lease Agreement, the Security Deposit was to be returned to the Plaintiff "forthwith" upon termination of the Lease Agreement.

14.  On or about February 5, 2004, the Plaintiff took possession of the Aircraft.

15.  At or about that time, the Plaintiff hired JetDirect Aviation, a private jet services company, to manage and operate the Aircraft.

-4-

16.   On or about February 5, 2009, the Plaintiff returned the Aircraft to the Defendants at the Airport pursuant to Section 6 of the Lease Agreement.

17.   At that time, the Plaintiff had fulfilled all of its redelivery obligations under the Lease Agreement, and no event of default existed.

18.   The Defendants have subsequently failed and refused to return the Security Deposit to the Plaintiff despite due demands.

19.   While the Aircraft is still located at the Airport, the Aircraft is in excellent condition and is capable of being flown out of the state and, indeed, out of the country, at any time.

20.   In the event that Plaintiff's Applications are not granted, there is a significant danger that both the Aircraft and the Security Deposit could be removed from the United States, thereby making it difficult, if not impossible, to satisfy the Plaintiff's claim for the return of the $1,000,000 security deposit.

21.   I believe that there is probable cause that a judgment will be rendered in this matter in favor of the Plaintiff in the amount of the prejudgment remedy sought, or in an amount greater than the amount

of the prejudgment remedy sought, taking into account any and all defenses, counterclaims or setoffs.

22.  I am not aware of any legitimate defenses, counterclaims or setoffs.

_____
John Georgiopoulos

Subscribed and sworn to before me on this the ____ day of July, 2009.

_____
Notary Public
My Commission Expires: March 22, 2012

Jorge Yengle
Notary Public, State of New York
No. 01YE6107131
Qualified in Queens County
Certificate filed in New York County
Commission Expires March 22, 2012

173220(v.3)

-6-

# Exhibit A

# AIRCRAFT LEASE AGREEMENT

This **AIRCRAFT LEASE AGREEMENT** (this "Lease") is made as of February 5, 2004 by and between **CONTINENT AIRCRAFT TRUST NO. 461**, a Delaware statutory trust ("Lessor"), and **GENERAL MARITIME CORPORATION**, a Marshall Islands corporation (the "Lessee") (collectively, the "Parties", individually a "Party").

1.     Aircraft. Subject to the terms and conditions of this Lease, Lessor agrees to lease to Lessee and Lessee agrees to lease from Lessor, the new Dassault Falcon 2000EX, serial number 15, registration mark N215EX, including its two (2) Pratt & Whitney PW 308C engines, serial numbers PCE-CF0042 and PCE-CF0025, together with all parts, additions, accessories, and components installed thereon, and including all radios, avionics and additional equipment described on Exhibit A attached hereto and all available log books, manuals, maintenance records and technical records (collectively, the "Aircraft").

2.     Term and Options to Purchase.

    a.     The term of this Lease (the "Initial Term") commences on the date of this Lease and expires five (5) years thereafter, unless renewed or terminated in accordance with the terms of this Lease. So long as no Event of Default (as defined below) shall have occurred and be continuing, Lessee may renew this Lease for a term equal to the Initial Term (the "Renewal Term") at the same rent payable and in accordance with the terms of this Lease by providing written notice to Lessor during the period between one hundred eight (180) and sixty (60) days prior to the expiration of the Initial Term.

    b.     During the period between one hundred eighty (180) and sixty (60) days prior to the expiration of the Initial Term or, if the Lease is renewed pursuant to paragraph 2.a above, the Renewal Term (the "Option Period" and so long as no Event of Default (as defined below) shall have occurred and be continuing, Lessee may exercise an option (the "Option") to purchase the Aircraft from Lessor. Notice of the intent to exercise the Option shall be provided to Lessor in writing during the Option Period ("Purchase Option Notice"). Pursuant to the Option, Lessee shall have the exclusive right to purchase the Aircraft for a purchase price (the "Purchase Price") equal to: (i) if the Option is exercised during the Initial Term, Nineteen Million One Hundred Twenty Five Thousand Dollars (U.S. $19,125,000); or (ii) if the Option is exercised during the Renewal Term, its then fair market value, which shall be deemed an amount equal to the residual value computed with a five percent (5%) annual depreciation applied to Lessor's capitalized cost of the Aircraft that will be for the purpose of this Lease the amount of Twenty Five Million Five Hundred Thousand Dollars (U.S. $25,500,000). Payment of the Purchase Price, applicable sales taxes, if any, (provided that the Parties shall agree to a delivery location that is free of sales taxes or other imposts) together with all other amounts due and owing by Lessee under the Lease, including, without limitation, rent payable under this Lease, shall be made in immediately available funds against delivery of a FAA Bill of Sale (AC Form 8050-2) and a Warranty Bill of Sale transferring to Lessee all right, title and interest of Lessor in and to the Aircraft (whereby title to the Aircraft shall pass and be conveyed to Lessee or its assignee/designee free and clear of all mortgages, claims, charges, pledges, liens, encumbrances, transfer restrictions, leases, and any other security interests of record with the FAA or otherwise) **ON AN "AS IS" BASIS, WITHOUT ANY WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION, THE CONDITION OF THE AIRCRAFT, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. LESSOR MAY SPECIFICALLY DISCLAIM ANY SUCH REPRESENTATIONS AND WARRANTIES.** The closing of a sale pursuant to this

Option shall occur on a date and at a time mutually agreed to by Lessor and Lessee to occur not more than thirty (30) days from the date of the expiration of the Initial Term (if the Purchase Option Notice is given during the Initial Term) or the Renewal Term (if the Purchase Option Notice is given during the Renewal Term). Notwithstanding the foregoing, Lessor may reject the Lessee's offer to purchase the Aircraft upon Lessee's exercise of the Option by providing Lessee written notice thereof on or before thirty (30) days from the date of Lessee's Purchase Option Notice. If Lessee exercises the Option (and Lessor has not timely rejected it) and the sale does not occur by the thirtieth (30th) day after the expiration of the Initial Term or, as the case may be, the Renewal Term, notwithstanding that Lessor has performed all its duties and obligations and is ready willing and able to consummate the sale, Lessor shall have the right at the termination of the Initial Term or, as the case may be, the Renewal Term, to sell the Aircraft to any third party under any terms and conditions. If Lessee does not exercise the Renewal Term and Lessor enters into an arrangement to sell the Aircraft to a third party within ninety (90) days from the termination of the Initial Term (or, as the case may be, the Renewal Term), Lessee shall have the right to purchase the Aircraft on the same terms and conditions as set forth in such third party purchase arrangement; in the event of such a third party purchase arrangement, Lessor will provide written notice of such third party purchase arrangement to Lessee, and Lessee must agree in writing to purchase the Aircraft pursuant to the same terms as the third party arrangement within ten (10) days of the date of such written notice by Lessor.

        c.      Notwithstanding anything to the contrary as set forth hereinabove, should Lessor reject Lessee's exercise of the Option, Lessee shall nonetheless be entitled to renew the Lease at the same rent payable and in accordance with the terms of this Lease for the Renewal Term, provided Lessee gives written notice to Lessor at least ten (10) days prior to the expiration of the Initial Term, subject however to an extension mutually agreed to between the Parties or an extension for the benefit of Lessee, as required as a result of events of *force majeure*.

        3.     <u>Delivery to Lessee</u>.  Lessor or its designated representative shall deliver to Lessee or to its designated representative, the Aircraft and all applicable records at Bradley International Airport (BDL) Windsor Locks, Connecticut on or around February 9, 2004 ("Delivery Date"). The Parties shall acknowledge delivery by executing an Aircraft Delivery and Acceptance Receipt substantially in the form of <u>Exhibit B</u> attached hereto.

        4.     <u>Rent</u>.  Lessee will pay Lessor as the rental the amount of One Hundred Twenty Five Thousand Dollars (U.S. $125,000) per month (the "Rental") plus applicable taxes, if any. The Rental will be payable at the end of each month through the Initial Term and, if applicable, the Renewal Term to Lessor at the following address: Continent Aircraft Trust No. 461 c/o Aircraft Guaranty Title & Trust, LLC, 515 N. Sam Houston Parkway East, Suite 305, Houston, Texas 77060, except that solely for the period from the actual Delivery Date through the end of February 2004 (the "Interim Period"), Lessor agrees that Lessee shall pay to Lessor as rental an amount equal to the Rental, divided by twenty-nine (29), multiplied by the number of days in the Interim Period (the "Interim Rent"). Lessee shall pay the Interim Rent at the end of February 2004.

        5.     <u>Base</u>.  Lessee will base the Aircraft at Waterbury-Oxford airport, Oxford, Connecticut (the "Home Base") and the Aircraft will be hangared at this location when not in use in accordance with customary industry standards.  Lessee may change the Home Base during the Initial Term or the Renewal Term, if applicable by providing Lessor written notice, provided the Home Base is located within the Continental United States.  In the event Lessee desires to move the Home Base outside the Continental United States, Lessee shall first obtain Lessor's written consent, which shall not be unreasonably withheld and will be deemed to have been given if,

within thirty (30) days of receipt by Lessor of a request for such consent, Lessor has not expressly refused it in writing.

6.   Return.  Lessee will return the Aircraft and all logs and records required to be maintained under this Lease to the Home Base or such other location mutually agreed to between the Parties upon expiration or termination of the Initial Term or the Renewal Term, as applicable. Lessee will return the Aircraft to Lessor in the condition in which the Aircraft is required to be maintained in accordance with paragraph 8, normal wear excepted.  The Parties shall acknowledge redelivery of the Aircraft by executing an Aircraft Redelivery and Acceptance Receipt substantially in the form of Exhibit C attached hereto.

7.   Operation.  Lessee will at all times when operating the Aircraft be in operational control of the Aircraft and will not, except with Lessor's prior written consent, sublet the Aircraft and Lessee will be solely responsible for its possession and use.  Notwithstanding the foregoing (but without limiting any Lessee's obligations and responsibilities hereunder), Lessor expressly acknowledges and accepts that Lessee may from time to time (i) enter into subleases and other arrangements as allowed under Federal Aviation Regulations ("FAR") Part 91, Subpart F (FAR § 91.501 et seq.), and (ii) charter the Aircraft by placing it on the operation specifications of a U.S. operator that holds an Air Carrier Certificate or Operating Certificate issued by the FAA for operations under FAR Part 135 ("Commercial Operator").  With respect to all such charter flights, the Commercial Operator shall have and retain "operational control" of the Aircraft as defined in the applicable FAR, including 14 CFR § 135.77 and 135.115; and (iii) have and retain "possession, command and control" of the Aircraft.  Lessee will not, and will ensure that no third person will, use or operate the Aircraft in violation of any law, regulation or order of any governmental authority, or in violation of the Aircraft airworthiness certificate, license or registration, or in breach of any term or condition of any insurance policy required under this Lease, or use the Aircraft for any purpose, in any manner and in any area excluded from coverage by the terms of any insurance policy required under this Lease.  Lessee will, at all times, employ or contract for pilots to operate the Aircraft who are duly qualified, current, and rated in the Aircraft and whose licenses are in good standing, and who meet the standards established by the FAA and by any insurance policy required under this Lease.  Lessee will bear the cost of pilot salaries and expenses and, in addition, will bear the cost of fuel and oil, lubricants and other additives; hanger and tie-down charges; landing fees, airport taxes and similar assessments; and any fees, fines or penalties arising out of Lessee's operation of the Aircraft.  Lessee shall procure that the registration of the Aircraft with the FAA shall remain unchanged and in full force and effect at all times.

8.   Maintenance.  Lessee will, at all times, keep the Aircraft in a fully operational, duly certified and airworthy condition, maintained in accordance with the Aircraft manufacturer's recommended inspection program and FAA regulations.  Lessee will bear all maintenance costs (including, but not limited to, engine maintenance, ferry flights necessary to perform all maintenance, hull maintenance and painting, mechanical equipment maintenance, replacement and repair and modifications mandated by airworthiness directives and mandatory operational modifications) and Lessee shall not be entitled to any reimbursement therefor from Lessor, except as provided under paragraph 19 with respect to the Reserves.  All replacement parts supplied by Lessee will be of the type approved by the applicable manufacturer, and will be of the same quality as the replaced part.  Lessee will not in any way alter, modify or make additions or improvements to the Aircraft, except as required by this paragraph, without the prior written consent of Lessor, which shall not be unreasonably withheld.  All alterations, modifications, additions and improvements which are made become the property of Lessor and are subject to the terms of this Lease.

9.    Records and Reports. Lessee will maintain all aircraft logs and records in accordance with FAA regulations and will monthly, if requested, and at the expiration of the Lease Term or earlier termination deliver such records to Lessor. Not later than on the twentieth (20th) day of each quarter, Lessee will provide Lessor with a report containing information on (i) the number of flight hours and cycles of the Aircraft, and (ii) any incidents and accidents, in each case during the immediately preceding quarter.

10.    Insurance. Lessee will, at all times, at its own expense, maintain a policy or policies of insurance with premiums thereon fully paid in advance, issued by and binding upon a solvent insurance company, naming Lessor as an additional named insured, insuring against personal injury, death, or property damage or loss arising out of or in any manner occasioned by the act, omission or negligence of Lessor, Lessee, their officers, directors, shareholders, employees, agents or invitees or others in custody, maintenance, use or operation of the Aircraft, in flight and on the ground, and further that such policy or policies shall afford minimum protection in the following amounts:

a.    Not less than Seventy Five Million Dollars (U.S.$75,000,000) per occurrence comprehensive general liability insurance; and

b.    Not less than Twenty Five Million Five Hundred Thousand Dollars (U.S. $25,500,000) aircraft hull, engine and other property casualty insurance.

Any such insurance shall provide that all losses, other than losses covered by the insurance referred to in sub-paragraph a. above (with respect to liability coverage) shall be paid to Lessor as loss payee as its interest as owner of the Aircraft may appear.

11.    Loss or Damage. Subject to credit to Lessee for any insurance payments received by Lessor as a result of claims for damages, loss, theft, destruction, confiscation, expropriation or war risk, Lessee will bear the entire risk of loss, theft, confiscation, damage to or destruction of the Aircraft from any cause whatsoever. In the event that the Aircraft is lost, stolen, damaged beyond repair, confiscated, seized, confiscated or expropriated, the Rental will cease to accrue, this Lease will terminate, Lessee shall have no further duties, obligations or liabilities to Lessor, other than for any damage not covered by insurance, and Lessor will be entitled to recover possession, if any, of the Aircraft. If a casualty occurrence has occurred which does not result in a total loss of the Aircraft, but rather damages to the Aircraft, which can be reasonably repaired, then Lessee shall proceed to remedy and/or repair the Aircraft subject to Lessee receiving any insurance payments as a result of claim(s) for such damages.

12.    Indemnification. Lessee will indemnify and save harmless Lessor, its successors and assigns, from and against any and all loss (including Lessee's own loss of use), claims (including, without limitation, claims involving strict or absolute liability in tort, damage, injury, death, liability and third party claims), demands, costs and expenses of every nature, including reasonable attorneys' fees, arising directly or indirectly from or in connection with the possession, maintenance, storage, use or operation of the Aircraft, except when arising from the default, willful misconduct or gross negligence of Lessor. Lessee's obligations under this paragraph will survive termination of this Lease and will remain in effect until all required indemnity payments have been made by Lessee to Lessor.

13.    Taxes. Lessee will pay to and indemnify the Lessor for, and hold the Lessor harmless from and against, all taxes, assessments, or withholdings of any nature, together with

wla-14761v4                                      4



any penalties, fines or interest thereon arising out of this Lease and imposed against Lessor, Lessee, or the Aircraft (other than taxes imposed on the net income of Lessor). Should Lessee desire to contest any sales tax arising out of this Lease, Lessee specifically agrees to pursue such contest in good faith, with due diligence and by appropriate proceedings, and Lessee must, prior to commencing such a contest, (i) agree in writing to indemnify Lessor against any cost or loss (including, without limitation, reasonable attorneys' fees) in connection with such contest, (ii) provide Lessor with adequate assurances of payment of such contested taxes, and (iii) agree in writing that the nonpayment of any such taxes or the contest of any such payment in such proceedings does not adversely affect the title, property or rights of Lessor. In case any report or return is required to be made with respect to any taxes, Lessee will either (after notice to Lessor) make such report or return in such manner as will show the ownership of the Aircraft in Lessor and send a copy of such report or return to Lessor, or will notify Lessor of such requirement and make such report or return in such manner as will be satisfactory to Lessor. Lessor agrees to cooperate fully with Lessee in the preparation of any such report or return at the expense of Lessee.

14.  Liens.  Lessee will not directly or indirectly create, incur, assume or suffer to exist any liens on the Aircraft, except for (i) liens created by or caused to be created by Lessor, and/or (ii) inchoate materialmen's, mechanic's, workmen's, repairmen's, employees' or other like liens arising in the ordinary course of the operation of the Aircraft for goods and/or services supplied by third parties with respect to the Aircraft the payment of which is not yet delinquent or contested by Lessee in good faith.  Lessee will promptly, at its own expense, take such action as may be necessary to duly discharge any such lien.

15.  Inspection.  Lessor or its designee has the right, but not the duty, to inspect the Aircraft at any reasonable time and upon reasonable notice, in flight, or wherever the Aircraft may then be located.  Upon Lessor's request, Lessee will advise Lessor of the Aircraft's location and, within a reasonable time, will furnish Lessor with all logs and records, regarding the Aircraft and its use, maintenance or condition and with all other documents evidencing Lessee's compliance with, and due performance of, its obligations hereunder.

16.  Lessee's Default.  Each of the following events shall constitute an "Event of Default" hereunder:

a.  Lessee fails to make payment of Rental within ten (10) days after the same becomes due; or

b.  Lessee fails to perform or observe any covenant, condition or agreement to be performed or observed by it under this Lease and, to the extent that such failure may be cured, fails to cure same within thirty (30) days after written notice thereof; or

c.  Any representation or warranty made by Lessee in this Lease is or becomes incorrect in any material respect; or

d.  Lessee becomes insolvent or ceases to do business as a going concern; or

e.  Lessee makes an assignment for the benefit of creditors, or if a petition is filed by or against Lessee under Title 11 of the United States Code or any successor or similar law; or

f.  A receiver is appointed for Lessee or any of Lessee's property.



wla-14761v4                              5

17.   Lessor's Remedies.

a.      Upon the occurrence of any Event of Default, Lessor may, in its sole discretion elect:

(1)      By notice in writing terminate this Lease, whereupon Lessee will, without further demand, forthwith return the Aircraft to Lessor and pay all accrued and unpaid amounts due under this Lease; or

(2)      Require Lessee to perform any obligation, covenant or agreement under this Lease.  Lessee agrees to pay all costs and expenses incurred for such performance.

b.      Upon the occurrence of any Event of Default, Lessee will be liable for all costs, charges and expenses, including reasonable legal fees and disbursements, incurred by the Lessor by reason of the occurrence of any Event of Default or the exercise of Lessor's remedies and Lessor may utilize the Security Deposit (as defined below) for satisfaction of such charges and expenses.

c.      No remedy is intended to be exclusive, but each will be cumulative and in addition to any other remedy referred to above or otherwise available at law or in equity.  The failure or delay of Lessor in exercising any rights granted under this Lease upon any occurrence of any of the contingencies set forth above shall not constitute a waiver of any such right.

18.   Security Deposit.  Upon execution of this Lease, Lessee shall deposit with Lessor One Million Dollars (U.S. $1,000,000) to be held by Lessor as security for Lessee's performance of its obligations under this Lease (the "Security Deposit").  Payment of the Security Deposit shall be a condition predicate to the effectiveness of this Lease.  The Security Deposit will not bear interest and, except as provided herein, will be returned forthwith to Lessee upon termination of the Lease and fulfillment in full of all Lessee's obligations hereunder, providing no Event of Default exists.

19.   Reserves.  Lessee will pay quarterly into an escrow account ("Escrow Account") set up with JP Morgan Chase in New York ("Escrow Agent") pursuant to a customary escrow agreement additional sums based on Lessee's use of the Aircraft for the purpose of providing for engines and airframe maintenance ("Reserves").  The Reserves shall be in the amount of Six Hundred Fifty Dollars (U.S. $650) per flight hour and shall be payable on or prior to the twentieth (20th) day in each quarter with reference to the number of flight hours in immediately proceeding quarter.  The Escrow Agent will promptly reimburse Lessee from the Escrow Account up to the amount paid into the Reserves for the costs of inspections, parts, labor, scheduled and unscheduled maintenance, and/or heavy maintenance, including but not limited to midlife and overhaul of the Aircraft's engines, upon presentation by Lessee of a statement and supporting documentation evidencing in reasonable detail the costs incurred by Lessee.  The Escrow Agent will also reimburse Lessee from the Escrow Account up to the amount paid into the Reserves for the costs of the fees, costs and expenses charged by the Escrow Agent in connection with the Escrow Account, which fees, costs and expenses shall initially be borne by Lessee.  The Escrow Agent shall exclude from reimbursement from Reserves, repairs covered by insurance payments made to Lessee.  Lessee agrees to return to Escrow Agent for deposit in the Escrow Account any funding received from Reserves which are subsequently determined not to be the subject of reimbursement from the Reserves.  Lessee is responsible for all expenses to the extent such

wla-14761v4                                  6

expenses exceed the amounts paid by Lessee as Reserves. In the event of such shortfall, Lessee is responsible for funding such expenses, and Lessee may not thereafter seek future reimbursement from the Reserves for any such deficiency. At the termination of the Initial Term or the Renewal Term, as applicable, including any termination of this Lease arising from the sale of the Aircraft by Lessor to Lessee, the balance remaining from the amount paid by Lessee as Reserves shall be exclusively for the account of Lessee and returned forthwith to Lessee upon fulfillment in full of its obligations hereunder, if:

           a.     Lessee gives the Purchase Option Notice during the Initial Term and, as a consequence, (i) the closing of the sale pursuant to the Option occurs, or (ii) Lessor rejects Lessee's exercise of the Option and the Lease is not renewed pursuant to paragraph 2.c. above; or

           b.     Lessee gives the Purchase Option Notice during the Renewal Term and, as a consequence, either (i) the closing of the sale pursuant to the Option occurs, or (ii) Lessor rejects Lessee's exercise of the Option.

Except as provided above, the balance remaining from the amount paid by Lessee as Reserves shall, at the termination of the Initial Term or the Renewal Term (as applicable), be for the account of Lessor and the Escrow Agent shall release such amount to Lessor.

      20.     <u>Assignment</u>. The Parties agree that this Lease shall be assignable by a Party with the prior written approval of the other Party.

      21.     <u>Notices</u>. Unless specifically provided to the contrary, all notices permitted or required by this Lease will be in writing and will be deemed given when received at the address set forth on the last page of this Lease, or such other address as may be designated by such Party in a written notice to the other Party.

      22.     <u>Entire Agreement</u>. The terms and conditions of this Lease constitute the entire agreement between the Parties with respect to the lease of the Aircraft and supersede all prior written and oral negotiations, representations and agreements, if any, between the Parties, and will be binding upon them, their successors, assigns and legal representatives.

      23.     <u>Modification of Agreement</u>. No change or modification or waiver of any term or condition of this Lease will be effective unless the change or modification is in writing and signed by the Parties.

      24.     <u>Citizen of the United States</u>. Lessor is a citizen of the United States within the meaning of the Federal Aviation Act, as amended, § 49 U.S.C. 40102(a)(15).

      25.     <u>Governing Law</u>. The Parties acknowledge that this Lease will be governed by and construed in all respects in accordance with the laws of the State of Delaware, regardless of the choice of law provisions or conflict of law principles of Delaware or any other jurisdiction. The Parties submit to the jurisdiction of the state and federal courts located in Wilmington, State of Delaware

      26.     <u>Waiver of Immunity from Jurisdiction</u>. To the extent that the Lessor or its Trustor or Beneficiary has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process with respect to itself or the Aircraft, Lessor or such other party hereby irrevocably waives such immunity in respect of its obligations under this Lease and any and all disputes, demands, claims and transactions arising under this Lease.



wla-14761v4                  7

27.  <u>Binding Arbitration</u>. Each of Lessee or Lessor may, in its sole discretion, submit any matter or dispute or difference of whatever nature howsoever arising under, out of or in connection with this Lease and the transactions contemplated under this Lease between the Parties to a final and binding arbitration upon written notice to that effect to Lessor, in accordance with the provisions of the UNCITRAL Rules for International Arbitration in force at the date of this Lease. Any arbitration pursuant to this clause shall be an international arbitration conducted under the New York Convention of 1958 and shall not be deemed to be a domestic arbitration under the laws of any other country. The place of arbitration shall be New York, N.Y., U.S.A. The arbitration will take place before a panel of three arbitrators, or such lesser number as may be mutually agreed by the Parties. Each Party shall appoint one arbitrator and the two arbitrators thus appointed shall choose the third arbitrator who will act as the presiding arbitrator.  Lessor (including its Trustor and its Beneficiary) hereby expressly waives all its rights (including the right to file an application for setting aside arbitral award). The foregoing terms and provisions shall not preclude the Parties from initiating any other legal or equitable proceeding prior to and/or in conjunction with the arbitration, seeking or obtaining interim, injunctive, conservatory or other equitable relief to restrain, prevent, or enjoin any breach of this Lease or any infringement of the Parties rights under this Lease and the transactions contemplated under this Lease.

28.  <u>Quiet Enjoyment</u>. So long as no Event of Default has occurred and is continuing, Lessee shall peaceably hold and quietly enjoy the Aircraft without interruption by Lessor or any person or entity claiming through Lessor.

29.  <u>Truth-In-Leasing</u>.

a.  LESSEE HAS REVIEWED THE AIRCRAFT'S MAINTENANCE AND OPERATING LOGS FOR THE AIRCRAFT AND CERTIFIES THAT THE AIRCRAFT HAS BEEN MAINTAINED AND INSPECTED IN ACCORDANCE WITH THE PROVISIONS OF PART 91 OF THE FEDERAL AVIATION REGULATIONS AND THE MANUFACTURER'S APPROVED INSPECTION REQUIREMENTS AND PRESENTLY COMPLIES WITH ALL APPLICABLE MAINTENANCE AND INSPECTION REQUIREMENTS OF PART 91 OF THE FEDERAL AVIATION REGULATIONS AND THE MANUFACTURER.

b.  LESSEE CERTIFIES THAT LESSEE, AND NOT LESSOR, IS RESPONSIBLE FOR OPERATIONAL CONTROL OF THE AIRCRAFT UNDER THIS LEASE.  LESSEE FURTHER CERTIFIES THAT LESSEE UNDERSTANDS ITS RESPONSIBILITY FOR COMPLIANCE WITH APPLICABLE FEDERAL AVIATION REGULATIONS.

c.  LESSEE CERTIFIES THAT LESSEE, AND NOT LESSOR, IS RESPONSIBLE FOR MAINTENANCE AND INSPECTION OF THE AIRCRAFT UNDER THIS LEASE. LESSEE FURTHER CERTIFIES THAT LESSEE UNDERSTANDS ITS RESPONSIBILITY FOR COMPLIANCE WITH PART 91 AND OTHER APPLICABLE PROVISIONS OF THE FEDERAL AVIATION REGULATIONS AND THE MANUFACTURER'S APPROVED INSPECTION REQUIREMENTS.

d.  LESSEE UNDERSTANDS THAT AN EXPLANATION OF FACTORS BEARING ON OPERATIONAL CONTROL AND PERTINENT FEDERAL AVIATION REGULATIONS CAN BE OBTAINED FROM THE NEAREST FAA FLIGHT STANDARDS

wla-14761v4                                    8

DISTRICT OFFICE, GENERAL AVIATION DISTRICT OFFICE, OR AIR CARRIER DISTRICT OFFICE. FURTHER, THE PARTIES CERTIFY THAT A TRUE COPY OF THIS LEASE WILL BE MAILED, WITHIN 24 HOURS OF ITS EXECUTION TO: AIRCRAFT REGISTRATION BRANCH, ATTN: TECHNICAL SECTION, P.O. BOX 25724, OKLAHOMA CITY, OKLAHOMA 73125.

e.     THE PARTIES HEREBY CERTIFY THAT A COPY OF THIS LEASE WILL BE CARRIED ON THE AIRCRAFT AT ALL TIMES, AND WILL BE MADE AVAILABLE FOR INSPECTION AND REQUEST BY AN APPROPRIATELY CONSTITUTED AND IDENTIFIED REPRESENTATIVE OF THE FAA.

30.     <u>Execution in Counterparts</u>. This Aircraft Lease Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

[Remainder of page blank; signature page immediately below.]

wla-14761v4                              9                         

**IN WITNESS WHEREOF**, the Parties hereto have each caused this Lease to be duly executed by their respective authorized officers.

General Maritime Corporation

By: _____
Name: Peter C. Georgiopoulos
Title: Chairman of the Board and
  Chief Executive Officer
Telephone: (212) 763-5600
Facsimile: (212) 763-5603

Notice Address:
General Maritime Corporation
35 West 56th Street
New York, New York 10019

Continent Aircraft Trust No. 461

By: Aircraft Guaranty Title & Trust, LLC
in its capacity as Trustee

By: _____
Name: Dr. Connie L. Wood
Title: President

Telephone: (281) 445-7594
Facsimile: (281) 445-7599

Notice Address:
Continent Aircraft Trust No. 461 c/o Aircraft
Guaranty Title & Trust, LLC, 515 North Sam
Houston Parkway, East, Suite 305
Houston, Texas 77060

<u>**EXHIBIT A**</u>

<u>NEW 2003 FALCON 2000EX</u>

**S/N 015**
**(Delivery 1 Qtr. 2004)**

<u>**Airframe**</u>                                    <u>Engines</u>: Pratt & Whitney PW 308C

Total Time:     New                     (7000 hour TBO)      #1      #2
Landings:       New                     Hours since new:     New    New

APU: Honeywell GPC-3160

<u>**Avionics**</u>
F/D: Collins EFIS 4000                            SATCOM: Universal TT-5000 (Aero 1)
H.F: Dual Collins HF 9000/SELCAL                  A/P: Collins 4000
RADAR: Collins TWR 850 WX                         RAD/ALT: Dual Collins ALT55B
COMMS: Dual Collins VHF 422C                      EFIS: Collins 4000
NAVS: Dual Collins VIR 432                        TCAS: Collins TCAS 4000
DME: Dual Collins DME 442                         ADF: Dual Collins ADF 462
EGPWS: Honeywell Mk V/Windshear                   CVR: Honeywell w/2 hour recording
GPS FMS: Dual Collins FMS 6100                    FDR: Honeywell DFDR w/88 Parameters
XPDR: Dual Collins TDR 94D

<u>**Additional Equipment**</u>
Head-up Guidance-Flight Dynamics (CAT III)        Battery Temp system
3rd Honeywell IRS                                 3rd Baker Audio System
3rd Collins FMS 6100                              Securaplane Security System
Aeronetics BDI-302A Bearing Distance Ind.         Equipped for Part 135 or JAR OPS 1

<u>**Interior**</u>
Fireblocked 10 passengers in forward 4 place club with aft 4 place conference group across from 2
facing chairs. Woodwork finished in high gloss veneer. 46" forward galley with high temp and
microwave ovens and pocket door. Interior amenities include fax machine, AC outlets, dual DVD/CD
players with 18" Baker LCD monitor and 2 5.6" LCD displays, Airshow 400, third crew member seat.
Aft flushing lavatory.

<u>**Exterior**</u>
Overall white with blue and red stripes.

POWER OF ATTORNEY by Continent Aircraft Trust No. 461 for James Healey
Dated:  February 8th, 2004       EXHIBIT  B

## DELIVERY AND ACCEPTANCE RECEIPT

This receipt acknowledges full and satisfactory delivery and acceptance of the new Dassault Falcon 2000EX, serial number 15, registration mark N215EX, including its two (2) Pratt & Whitney PW 308C engines, serial numbers PCE-CF0042 and PCE-CF0025, together with all parts, additions, accessories, and components installed thereon, and including all radios, avionics and additional equipment and all available log books, manuals, maintenance records and technical records (collectively "Aircraft") in accordance with paragraph 3 of the Aircraft Lease Agreement ("Lease") dated as of February 5, 2004, by and between Continent Aircraft Trust No. 461, a Delaware statutory trust ("Lessor") and General Maritime Corporation, a Marshall Islands corporation ("Lessee").

The Aircraft was received by Lessee on the date and at the location set forth below and was determined to be in good order and condition, in accordance with the Lease, except as noted in the enclosed appendix setting forth the exceptions or discrepancies, if any.

The Aircraft is delivered as follows:

Aircraft

    Total Time   49:50          Total Landings   19

Engines

    Left Engine Hours      49:50      Cycles      19
    Right Engine Hours     28:15      Cycles      11
    Total APU Hours        61:0       Cycles

Location of Delivery:                    Hartford, Conn.

Date and Time of Delivery:               February 9, 2004 at 13:00

LESSEE:

General Maritime Corporation

By: _____

Its:  ATTORNEY IN FACT

LESSOR:

Continent Aircraft Trust No. 461

By:  _James Healey_____

Its:  ATTORNEY IN FACT

Page 2 of 3

**POWER OF ATTORNEY by Continent Aircraft Trust No. 461 for James Healey**
Dated: February 8th, 2004

STATE OF _Connecticut_ )
                       ) ss. _East Granby_
COUNTY OF _Hartford_   )

On _9th of February_, 2004, before me, _Cynthia G. Birmingham_ the
undersigned notary public in and for said County and State, personally appeared

_James Healey  and  Mark Shea_

               personally known to me *[or]*

  ✓          proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me
that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their
signature(s) on the instrument, the person(s) or the entity(ies) upon behalf of which the person(s)
acted executed the instrument.

WITNESS my hand and official seal.

_Cynthia G. Birmingham_
My commission expires on

_9/30/08_

Page 3 of 3

## EXHIBIT C

### REDELIVERY AND ACCEPTANCE RECEIPT

This receipt acknowledges full and satisfactory redelivery and acceptance of the new Dassault Falcon 2000EX, serial number 15, registration mark N215EX, including its two (2) Pratt & Whitney PW 308C engines, serial numbers PCE-CF0042 and PCE-CF0025, together with all parts, additions, accessories, and components installed thereon, and including all radios, avionics and additional equipment and all available log books, manuals, maintenance records and technical records (collectively "Aircraft") and all the Aircraft applicable records, in accordance with paragraph 5 of the Aircraft Lease Agreement ("Lease") dated as of February 5, 2004, by and between Continent Aircraft Trust No. 461, a Delaware statutory trust ("Lessor") and General Maritime Corporation, a Marshall Islands corporation ("Lessee").

The Aircraft was received by Lessor on the date and at the location set forth below and was determined to be in good order and condition, in accordance with the Lease, except as noted in the enclosed appendix setting forth the exceptions or discrepancies, if any.

The Aircraft is delivered as follows:

Aircraft

Total Time _____     Total Landings _____

Engines

Left Engine Hours _____     Cycles _____
Right Engine Hours _____    Cycles _____
Total APU Hours _____       Cycles _____

Location of Delivery: _____

Date and Time of Delivery: _____

LESSOR:

Continent Aircraft Trust No. 461

By: _____

Its: _____

LESSEE:

General Maritime Corporation

By: _____

Its: _____

wla-14761v4                                14

# POWER OF ATTORNEY
## By
## Continent Aircraft Trust No. 461

### February 5th, 2004

Aircraft Guaranty Title & Trust, LLC (a Delaware Limited Liability Company organized under the laws of the state of Delaware), Trustee of Continent Aircraft Trust No. 461, a Delaware Statutory Trust organized under the laws of Delaware on January 7th, 2004; hereby appoints James Healey as an authorized representative of the Trustee for the purpose of signing (on behalf of the Lessor – Continent Aircraft Trust No. 461) the "Delivery and Acceptance Receipt" *(a sample of which is attached)* for the delivery of one each Dassault Falcon model 2000EX, serial number 15, FAA registration mark – N215EX, including its two (2) Pratt & Whitney PW 308C engines, serial numbers PCE-CF0042 and PCE-CF0025, together with all parts, additions, accessories, and components installed thereon, and including all radios, avionics and additional equipment and all available log books, manuals, maintenance records and technical records (collectively "Aircraft") in accordance with paragraph 3 of the Aircraft Lease Agreement ("Lease") dated as of February 5, 2004, by and between Continent Aircraft Trust No. 461, a Delaware Statutory Trust ("the Lessor") and General Maritime Corporation, a Marshall Islands corporation ("the Lessee").

Questions pertaining to this appointment should be address to the undersigned at 515 North Sam Houston Parkway East, Suite 305, Houston, Texas 77060.  Phone:  +1-281-445-7594 or Fax:  +1-281-445-7599.

FOR:  AIRCRAFT GUARANTY TITLE & TRUST, LLC, TRUSTEE
    CONTINENT AIRCRAFT TRUST NO. 461

By:   _____
     Dr. Connie L. Wood, President

One enclosure as

Feb.09 04 01:51p                                                                    p.2

BY: GENERAL MARITIME / PCG;          212 763 5602;       FEB-9-04 11:48AM;        PAGE 2/2
Feb-09-04   04:47PM   From-                              Van Nuys        Y-836   P.001/001   F-827

**The Air Group, Inc.**

7426 Hayvenhurst Avenue, Van Nuys, California 91406
Phone: (818) 781-8890 • (800) 233-8890 • Fax: (818) 781-8951
www.theairgroup.com

# FACSIMILE

DATE:     February 6, 2004

TO:       Mr. Peter Georgiopoulos          Fax:   (212) 763-5602

FROM:     Mark Shea                        Page(s): 1 (one)

SUBJECT: Delivery Receipt Document

Mark Bloomer asked that I forward this to you for approval.

I, Peter Georgiopoulos, Chairman/CEO of General Maritime Corporation request
that Mark Shea, Director of Operations, The Air Group, Inc. act on my behalf in
signing the Delivery Receipt referred to in Appendix "B" of the lease agreement.

_____                    9 - Feb - 04
Mr. Peter Georgiopoulos                     _____
                                           Date

Please return by Fax: (201) 797-5019

| Honolulu | Los Angeles | San Francisco | Santa Ana | Denver | St Louis | Chicago | New York |
|----------|-------------|---------------|-----------|--------|----------|---------|----------|
| 800.233.8890 | 877.359.8890 | 877.966.8890 | 877.358.8890 | 800.780.0810 | 888.537.0390 | 888.891.8976 | 800.596.2262 |

**Exhibit B**

## REGISTRATION NOT TRANSFERABLE

| UNITED STATES OF AMERICA<br>DEPARTMENT OF TRANSPORTATION - FEDERAL AVIATION ADMINISTRATION<br>CERTIFICATE OF AIRCRAFT REGISTRATION | This certificate<br>must be in the air-<br>craft when operated. |
|---|---|

| NATIONALITY AND<br>REGISTRATION MARKS N97GM | AIRCRAFT SERIAL NO.<br><br>15 |
|---|---|

**MANUFACTURER AND MANUFACTURER'S DESIGNATION OF AIRCRAFT**

DASSAULT                    FALCON 2000EX
ICAO Aircraft Address Code: 53300756

I
S
S
U
E
D

T
O

AIRCRAFT GUARANTY TITLE AND TRUST LLC TRUSTEE
515 N SAM HOUSTON PKWY STE 305
HOUSTON TX 77060-4025

This certificate is
issued for registra-
tion purposes only
and is not a certifi-
cate of title.
The Federal Avia-
tion Administration
does not determine
rights of ownership
as between private
persons.

CORPORATION

It is certified that the above described aircraft has been entered on the register of the
Federal Aviation Administration, United States of America, in accordance with the Convention
on International Civil Aviation dated December 7, 1944, and with Title 49, United States Code,
and regulations issued thereunder.

U.S. Department
of Transportation

| DATE OF ISSUE<br><br>February 13, 2004 | *Marie C. Reby*<br>ADMINISTRATOR | 77060+4025 | Federal Aviation<br>Administration |
|---|---|---|---|

AC Form 8050-3(10/2003) Supersedes previous editions

| | | |
|---|---|---|
| RETURN DATE: | : | SUPERIOR COURT |
| | : | |
| | : | JUDICIAL DISTRICT |
| GENERAL MARITIME CORPORATION | : | OF ANSONIA-MILFORD |
| | : | AT MILFORD |
| v. | : | |
| | : | |
| AIRCRAFT GUARANTY TITLE & TRUST, | : | |
| LLC, in its capacity as TRUSTEE | : | |
| of CONTINENT AIRCRAFT TRUST | : | |
| NO. 461, and CONTINENT AIRCRAFT | : | |
| TRUST NO. 461 | : | JULY 13, 2009 |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
APPLICATIONS FOR PREJUDGMENT REMEDY
AND _EX PARTE_ TEMPORARY RESTRAINING ORDER**

I.   **PRELIMINARY STATEMENT**

This matter arises out of the lease of an aircraft by the
Plaintiff from the Defendants.  As with leases for real estate, the
aircraft lease here required the Plaintiff to give the Defendants a
security deposit which would be returned to the Plaintiff at the end
of the lease term.  The lease ended on February 5, 2009, and the
Plaintiff promptly returned the aircraft to the Defendants, but the
Defendants have thus far failed and refused to return the $1,000,000
security deposit to the Plaintiff.  The aircraft is currently stored
by the Defendants at the Waterbury-Oxford Airport in Oxford,
Connecticut.

The Plaintiff is about to commence an action against the Defendants in order to obtain the return of the security deposit. The Defendants have never disclosed the location of the security deposit to the Plaintiff, and the Plaintiff does not know where it is located. In order to collateralize the security deposit, the Plaintiff seeks to attach the aircraft. In order to insure that the aircraft remains at its current location in Connecticut, so that it is subject to attachment, the Plaintiff seeks the entry of a temporary restraining order prohibiting the Defendants from a) removing the aircraft from its present location; b) selling, transferring, assigning, encumbering, deregistering or exporting the aircraft; or c) cancelling the registration on the FAA Registry of the aircraft. Absent such an order, the aircraft could easily be removed from the United States. This would significantly diminish, if not completely eliminate, the Plaintiff's ability to collect upon any judgment which it may ultimately obtain against the Defendants, because the Defendants own no assets other than the aircraft. Similarly, the Plaintiff seeks the entry of a temporary restraining order prohibiting the Defendants from selling, transferring, assigning or encumbering the security deposit.

-2-

Therefore, it is critical that the *status quo* of the aircraft and the security deposit be maintained pending the hearing and determination of Plaintiff's Application for Prejudgment Remedy and, accordingly, an immediate *Ex Parte* Temporary Restraining Order should be granted.

## II.  **FACTUAL BACKGROUND**

On or about January 7, 2004, Aircraft Guaranty Financial Corporation ("Aircraft Financial"), as Grantor, and Defendant Aircraft Title & Trust, as Trustee, entered into a Declaration of Trust (the "Declaration") which created the Defendant Continent Aircraft Trust. *See* Affidavit of James M. Bergin in Support of Plaintiff's Applications for Prejudgment Remedy and *Ex Parte* Preliminary Injunction ("Bergin Affidavit") at ¶¶ 5 & 6.  Pursuant to the Declaration, Aircraft Financial appointed Aircraft Title & Trust as Trustee of the Trust.  Bergin Affidavit at ¶ 6.  Pursuant to the Declaration, Aircraft Financial and/or Aircraft Title & Trust agreed to cause a certain aircraft to be contributed to the Continent Aircraft Trust as Trust Property.  *Id.* at ¶ 7.

-3-

Thereafter, Aircraft Financial and/or Aircraft Title & Trust caused that certain Dassault Falcon 2000EX, serial number 15, FAA registration mark N97GM (formerly N215EX), including its two (2) Pratt & Whitney PW 308C engines, serial numbers PCE-CF0042 and PCE-CF0025, together with all parts, additions, accessories, and components installed thereon, and including all radios, avionics and additional equipment appurtenant thereto, and all available log books, manuals, maintenance records and technical records (collectively the "Aircraft") to be contributed to the Continent Aircraft Trust as Trust Property.  *See* Affidavit of John Georgiopoulos in Support of Plaintiff's Applications for Prejudgment Remedy and *Ex Parte* Preliminary Injunction ("Georgiopoulos Affidavit") at ¶ 7.

Pursuant to the Declaration, Aircraft Title & Trust, as Trustee, holds legal title to all Trust Property, including the Aircraft. Bergin Affidavit at ¶ 7.  Aircraft Title & Trust, in its capacity as Trustee of the Continent Aircraft Trust, is listed as the registered owner of the Aircraft on the Aircraft Registration System maintained by the Federal Aviation Administration.  *See id.* at ¶ 8.  To Plaintiff's knowledge, neither Aircraft Title & Trust, in its capacity as Trustee of the Continent Aircraft Trust, nor the Continent Aircraft

-4-

Trust itself, holds any other assets.  *See* Georgiopoulos Affidavit at ¶ 7.

On or about February 5, 2004, the Plaintiff as Lessee and the Continent Aircraft Trust as Lessor entered into an Aircraft Lease Agreement (the "Lease Agreement") pursuant to which the Plaintiff leased the Aircraft from the Continent Aircraft Trust.  *See* Georgiopoulos Affidavit at ¶¶ 5 & 6.  The Lease Agreement was executed on behalf of the Continent Aircraft Trust by Defendant Aircraft Title & Trust.  *See* Georgiopoulos Affidavit at ¶ 5.  The Lease Agreement was for a term of five years commencing on February 5, 2004 and expiring on February 5, 2009, at the rate of $125,000 per month.  *See* Georgiopoulos Affidavit at ¶¶ 6 & 9.  Further pursuant to the Lease Agreement, the Plaintiff was required to base the Aircraft at the Waterbury-Oxford Airport in Oxford, Connecticut (the "Airport").  *See* Georgiopoulos Affidavit at ¶ 10.  Upon expiration of the Lease, the Plaintiff was required to return the Aircraft to the Defendants at the Airport.  *See* Georgiopoulos Affidavit at ¶ 11.

Upon execution of the Lease Agreement, the Plaintiff deposited with the Continent Aircraft Trust $1,000,000 to be held by the Continent Aircraft Trust as security for Plaintiff's performance of

-5-

its obligations under the Lease Agreement (the "Security Deposit"). *See* Georgiopoulos Affidavit at ¶ 12.  Further pursuant to the Lease Agreement, the Security Deposit was to be returned to the Plaintiff "forthwith" upon termination of the Lease Agreement.  *See* Georgiopoulos Affidavit at ¶ 13.  The Defendants have never disclosed the location of the Security Deposit to the Plaintiff, and the Plaintiff does not know where it is located.  *See* Georgiopoulos Affidavit at ¶ 12.

On or about February 5, 2004, the Plaintiff took possession of the Aircraft.  *See* Georgiopoulos Affidavit at ¶ 14.  JetDirect Aviation ("JDA"), a private jet services company that provided aircraft management and aviation services, was hired by the Plaintiff to manage and operate the Aircraft.  *See* Georgiopoulos Affidavit at ¶ 15.

During the term of the Lease Agreement, the Aircraft was maintained in accordance with the manufacturers' requirements and JDA's General Maintenance Manual.  *See* Affidavit of James A. Calabrese in Support of Plaintiff's Applications for Prejudgment Remedy and *Ex Parte* Preliminary Injunction ("Calabrese Affidavit") at ¶ 5.  All Airworthiness Directives and Mandatory Service Bulletins were complied

-6-

with and all service records maintained at the Airport.  *See* Calabrese Affidavit at ¶ 7.  The Aircraft was maintained at all times in accordance with all applicable FAA regulations and the manufacturers' recommended maintenance and inspection programs.  *See* Calabrese Affidavit at ¶ 8.  The Aircraft was not involved in any incident or accident and no significant damage was incurred by the Aircraft or any part thereof.  *See* Calabrese Affidavit at ¶ 9.  The Aircraft was at all times maintained in a fully operational, duly certified and airworthy condition.  *See* Calabrese Affidavit at ¶ 10.  The Aircraft was returned in the condition it was required to be maintained, along with all logs and records that were required to be maintained with the Aircraft under applicable FAA regulations.  *Id.*

In short, the Aircraft was operated and maintained under all guidelines set forth by JDA, and JDA complied with all rules and regulations with respect to aircraft airworthiness and FAA compliance. *See* Calabrese Affidavit at ¶ 11.

On or about February 5, 2009, the Plaintiff returned the Aircraft to the Defendants at the Airport as required by the Lease Agreement. *See* Georgiopoulos Affidavit at ¶ 16.  At that time, the Plaintiff had

-7-

fulfilled all of its obligations under the Lease Agreement, and no event of default existed.  *See* Georgiopoulos Affidavit at ¶ 17.

Despite the foregoing, the Defendants failed and refused to return the Security Deposit to the Plaintiff despite due demand.  *See* Georgiopoulos Affidavit at ¶ 18.  The Aircraft is currently located at the Airport, is in excellent condition, and is capable of being flown out of the Airport and, indeed, out of the country, at any time. *See* Georgiopoulos Affidavit at ¶ 19.

## III. ARGUMENT

### A.   There is Probable Cause for Issuance of a Prejudgment Remedy

Connecticut law defines a prejudgment remedy as "any remedy or combination of remedies" that enables a person to attach the property of an opponent in a civil action.  *See Conn. Gen. Stat.* § 52-278a(d). A prejudgment remedy should be awarded where the party seeking the remedy shows that there is "probable cause" to sustain the validity of its claim.  *See Conn. Gen. Stat.* § 52-278d; *see also Bank of Boston Connecticut v. Schlesinger,* 220 Conn. 152, 156 (1991).  Under the probable cause standard, a party "does not have to establish that he will prevail, only that there is probable cause to sustain the

-8-

validity of the claim. . . . Probable cause is a flexible common sense standard.  It does not demand that a belief be correct or more likely true than false." *Corsino v. Telesca,* 32 Conn. App. 627, 631-32, *cert. denied,* 227 Conn. 931 (1993).

The Plaintiff asserts claims for breach of contract, unjust enrichment, and violation of the Connecticut Unfair Trade Practices Act.  Based upon the facts as set forth above, the Plaintiff is likely to succeed on each of these claims.

Accordingly, a prejudgment remedy in the amount of $1,000,000 should enter.

**B.   An Ex Parte Temporary Restraining Order Should Enter**

As explained above, there is probable cause, as well as a substantial likelihood, that the Plaintiff will prevail on its claims; however, any judgment that may be entered will be futile unless the *status quo* of the Aircraft is maintained.

Temporary restraining orders may be entered as temporary relief ancillary to a prejudgment remedy.  *See Conn. Gen. Stat.* § 52-278c(c); *Fermont Division, Dynamics Corporation of America, Inc. v. Smith,* 178 Conn. 393, 398 (1979); *Connecticut Savings Bank v. Realty Capital Acquisition Corp.,* Superior Court, Judicial District of New Haven, No.

-9-

294971, 1990 WL 283912, at *1 (July 24, 1990) (denying defendant's motion to dissolve temporary restraining order entered in conjunction with application for a prejudgment remedy that enjoined defendant from transferring moneys in bank accounts).

As explained by the Appellate Court, "a temporary restraining order is a mechanism by which the *status quo* is maintained between the time an application for prejudgment remedy is filed and the time set for a hearing on that motion." *Sylvia v. Westport Bank and Trust Co.,* 14 Conn. App. 579, 582 (1988).

The Plaintiff's right to receive the return of its Security Deposit is in serious jeopardy absent injunctive relief. Absent injunctive relief there is nothing preventing the Defendants from removing the Aircraft from Connecticut and transferring it beyond the jurisdiction of American Courts. In fact, there is a danger that as soon as the Defendants receive notice of these Applications, they will attempt to remove the Aircraft, absent immediate injunctive relief.

Without injunctive relief, the true "res" in dispute will be gone and the Plaintiff may never be able to collect its judgment. Indeed, it is common for courts to issue *ex parte* temporary restraining orders to preserve the *status quo* of assets available to satisfy any

-10-

prejudgment remedy.  *See, e.g., Connecticut Savings Bank v. Realty Capital Acquisition Corp.,* 1990 WL 283912, at *1 (ex parte temporary restraining order granted to prevent defendant from alienating his assets before they can be attached or garnished by the plaintiff); *Bank of Boston Connecticut v. Schlichting,* Superior Court, No. 324106, 1997 WL 325393, at *3 (June 6, 1997) (ex parte temporary restraining order granted to prevent defendant from transferring funds in a mutual account out of the country); *Salamone v. DVR Direct Inc.,* Superior Court, judicial district of Waterbury, No. 0125375, 1995 WL 139461, at *1 (Mar. 23, 1995) (ex parte temporary restraining order granted enjoining defendant from disposing or expending various funds); *accord Chandler v. Hale,* 173 Conn. 276 (1977) (acknowledging the power of a court to issue a temporary injunction to restrain the dissipation of assets in order to protect a creditor's damages remedy).

Furthermore, no harm would be suffered by the Defendants due to the imposition of a temporary restraining order, since the Plaintiff is simply asking the court to maintain the *status quo.*  Accordingly, an *ex parte* temporary restraining order should enter prohibiting the Defendants from removing the Aircraft from the Airport, or from selling, transferring, assigning, encumbering, deregistering

-11-

exporting, or cancelling the registration on the FAA Registry of the Aircraft, or from selling, transferring, assigning or encumbering the Security Deposit.  Under the circumstances, good cause exists for issuance of the temporary restraining order without bond.

IV.   CONCLUSION

WHEREFORE, for all of the foregoing reasons, the Plaintiff's Application for Prejudgment Remedy and Application for Ex Parte Temporary Restraining Order should be granted in all respects.

PLAINTIFF,

By

Andrew B. Nevas
LEVETT ROCKWOOD P.C.
33 Riverside Avenue
P.O. Box 5116
Westport, CT  06881
Telephone:  (203) 222-0885
Facsimile:  (203) 226-8025
Juris No. 101078

173171(v.4)

-12-

Vvestlaw.

Not Reported in A.2d                                                                    Page 1
Not Reported in A.2d, 1990 WL 283912 (Conn.Super.), 2 Conn. L. Rptr. 167
(Cite as: 1990 WL 283912 (Conn.Super.))

C

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut, Judicial District of
New Haven.
CONNECTICUT SAVINGS BANK
v.
REALTY CAPITOL ACQUISITION CORP., et al.
No. 29 49 71.

July 24, 1990.

*MEMORANDUM OF DECISION*

HODGSON, Judge.

*1 Thirteen motions, applications, and objections
(Docket items 159, 172.55, 193, 200, 201, 207,
210, 212, 212.50, 214, 215, 216, 217) were spe-
cially scheduled as special proceedings and heard
by the court on July 18, 1990.

The motion of defendant Carolyn Germain to dis-
charge a lis pendens was marked off by agreement
of counsel (Docket item 159).

The court denied the plaintiff's Motion to Compel
Defendants to Surrender Assets (Docket item 200)
and its motion to compel defendant Staiger to pro-
duce certain personal property (Docket item 201) as
premature, no judicial finding of probable cause to
attach the assets of these defendants having been
established prior to the filing of the motion.

The plaintiff has moved (Docket item 193) for dis-
closure of assets of the following defendants;
George E. Alexander, Jr., John R. Baksa, Sr., Ken-
neth E. Beyer, Alan J. Biren, Michael J. Duchesne,
Mark S. Germain, Clement E. Hamilton, Lubbie
Harper, Jr., Ralph S. Kaufman, Vito M. Mazza, Re-
alty Capitol Acquisition Corp., **Realty Capital As-
sociates**, Martin B. Rubin, Herbert O. Staiger, and

Theodore Zajac.

Section 230A P.B. provides for an order to "any ap-
pearing party against whom a prejudgment remedy
has been granted to disclose property in which he
has an interest."

The only judicial finding of probable cause of re-
cord in this case is subsumed in Judge Fracasse's
order of January 3, 1990 granting the plaintiff's ap-
plication for a prejudgment attachment of certain
real property of defendants alleged to have been
fraudulent transferees. This order does not include a
finding of probable cause as to any of the defend-
ants as to whom the plaintiff now seeks an order for
disclosure of assets, nor has an application for a
prejudgment attachment been granted as to any de-
fendant who is the subject of the plaintiff's motion
for disclosure of assets. Accordingly, the motion is
denied.

The remaining scheduled matter is the motion of
defendant Mark S. Germain to dissolve the tempor-
ary restraining order entered against him *ex parte*
by Judge Fracasse on January 3, 1990. That order
restrains defendant Mark S. Germain, along with
other defendants, from "assigning, diminishing, en-
cumbering, pledging, or transferring any interest
any of them may have in any mutual fund, accounts
receivable, money market account, stock certificate
or any othr debt or equity instrument of any corpor-
ation, any unlimited or general partnership or any
life insurance policy or cash surrender value repres-
entative thereof, all until further Order of this Court."

The restraining order also prohibits this defendant
from "altering, amending or modifying, in any
manner, their rights to receive or the manner in
which they are to receive monies as the custodian
or owners of any such assets, properties or interests,
all until further order of this court."

Temporary restraining orders may be entered pursu-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1990 WL 283912 (Conn.Super.), 2 Conn. L. Rptr. 167
(Cite as: 1990 WL 283912 (Co      Super.))

ant to § 52-278c(c) C.G.S. as temporary relief ancillary to a prejudgment remedy. *Fermont Division, Dynamics Corporation of America, Inc., v. Smith,* 178 Conn. 393, 398 (1979).

*2 Because the restraining order against defendant Mark Germain was entered *ex parte,* it was the plaintiff's burden, upon Germaine's moving to dissolve the order pursuant to § 52-278e, to present evidence sufficient to establish its entitlement to this injunctive relief.

The purpose of a temporary restraining order is the same as the purpose of a preliminary injunction: to preserve the status quo and protect the movant from immediate and irreparable harm until the rights of the parties can be established upon a full hearing on the merits of the claim for permanent injunctive relief. *Olcott v. Pendleton,* 128 Conn. 292, 295 (1941); *Deming v. Bradstreet,* 85 Conn. 650, 659 (1912).

In assessing what it termed the analogous situation of the granting of a stay of an administrative order in *Griffin Hospital v. Commission on Hospitals and Health Care,* 196 Conn. 451, 457 (1985), the Connecticut Supreme Court, citing *Olcott v. Pendleton, supra,* stated that entitlement to such temporary relief requires a showing of 1) probable success on the merits of the claimant and 2) a balancing of the results which may be caused to one party or the other from the granting of such temporary relief. The court in *Griffin Hospital, supra* at 488, also cited with approval *Covenant Radio Corporation v. Ten Eighty Corporation,* 35 Conn.Sup. 1, 3 (1977), which enunciates as additional requirements for temporary injunctive relief 3) irreparable injury and 4) lack of an adequate remedy at law.

The plaintiff's application for a temporary restraining order states that defendant Mark Germain is likely to alienate his assets before they can be attached or garnished by the plaintiff to satisfy his obligations as guarantor of a loan with a present balance of approximately $3.7 million.

The plaintiff established that it will probably succeed on the merits of its claim against him as a guarantor of a multi-million dollar loan which is now in default. The plaintiff further established that this defendant has, during the pendency of the loan, transferred property to his wife and has experienced a rapid and considerable diminishment of his assets.

The defendant presented evidence to the effect that the temporary restraining order prevents him from withdrawing from his money market account funds which he uses for living expenses. The defendant notably did not testify that he was unable to meet his living expenses or that he lacked funds for that purpose from sources not affected by this order.

The court finds that the harm to the plaintiff from the diminution or diversion of assets, necessitating laborious recovery, outweighs the limited inconvenience testified to by the defendant. The court further finds the remaining criteria for temporary relief are satisfied.

The motion of Mark S. Germain to dissolve the temporary injunction is denied.

Conn.Super.,1990.
Connecticut Sav. Bank v. Realty Capitol Acquisition Corp.
Not Reported in A.2d, 1990 WL 283912 (Conn.Super.), 2 Conn. L. Rptr. 167

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 325393 (Conn.Super.)
(Cite as: 1997 WL 325393 (Conn.Super.))

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut.
BANK OF BOSTON CONNECTICUT
v.
Walter E. SCHLICHTING et al.
No. 324106.

June 6, 1997.

Memorandum of Decision

GROGINS.

*1 On April 23, 1997, the plaintiff, Bank of Boston Connecticut, initiated an ex parte motion for prejudgment remedy, temporary restraining order and preliminary injunction to secure the sum of $500,000 by attaching the real property at 102 Holmes Road, Ridgefield, Connecticut, which property is now owned by the codefendant, Angela Schlichting, claiming a fraudulent transfer and, further, to garnishee Chase Bank as agent, transfer debtor of defendant Angela Schlichting. The bank's officer, Judith L. Germano, testified that the exact payoff now due from the defendant, Walter E. Schlichting, was $451,381.39; broken down to $377,564.80 as principal balance, and interest of $68,528.05. Defendants' counsel, Attorney Bottinick, stipulated to the debt and the fact that it was outstanding and past due. In addition, the costs of collection were estimated at approximately $20,000. Ms. Germano further testified that the loan was in default as of July, 1995. On cross-examination, she testified that the loan was current in 1993 and 1994, and up through July of 1995. She stated that the acceleration notice was sent after the last payment in July, probably in September, 1995. Defense counsel indicated in his questioning that the acceleration took

place in November, 1995. The defendant, Walter Schlichting, testified he and his wife purchased their share of Carolyn Rose, Inc. in 1987, and he personally guaranteed the bank's note. Plaintiff's exhibit twelve. He testified that although James T. Sprague was a co-owner of Carolyn Rose, Inc. (hereinafter called Rose), he and his wife managed the property and paid the bills, including the mortgage. He confirmed that the last payment on the note was in July of 1995. The exhibits offered by the plaintiff included exhibit one, fifty shares of stock in Rose in the name of Walter and Angela Schlichting. Plaintiff's exhibit two, the 1992 United States tax return for Rose, shows zero income and a net loss of $23,596. Plaintiff's exhibits three and four were tax returns for this corporation for 1993 and 1994, and in each of those years, Rose had zero income. In 1993, Rose had a net loss of $22,844 and in 1994, a net loss of $26,891. Plaintiff offered tax returns for the defendants (exhibit five) for 1990, showing their adjusted gross income of $81,108, and for 1993, (exhibit six), an adjusted gross income of $172,876. For the tax year 1994, their adjusted gross income was $30,490 (exhibit seven). Plaintiff's exhibit eight, a warranty deed dated August 9, 1979, conveying title jointly to the defendants of property at 102 Holmes Road. Plaintiff's exhibits nine and ten consisted of the quitclaim deed from Walter Schlichting to his wife, Angela Schlichting, dated October 22, 1993, and the state conveyance tax form showing "no consideration." He also testified that the transfer to his wife of the 102 Holmes Road property was part of an estate plan recommended by Attorney O'Grady. Plaintiff's exhibit eleven consisted of an eight page estate planning form prepared by the defendant, Walter Schlichting, for Attorney Kevin O'Grady of Westport dated January 25, 1994. On that form, Walter Schlichting listed assets of $185,700 and his wife, Angela, assets of $346,200, and together they held jointly $91,500. In plaintiff's exhibit thirteen, the plaintiff submitted an analysis of their mutual assets with Walter Schlichting having assets of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1997 WL 325393 (Conn.Super.)
(Cite as: 1997 WL 325393 (Co    Super.))

$270,750 and his wife, Angela Schlichting, having assets of $666,550 as of January, 1994. The same document showed his liabilities as $527,000 and her liabilities as $142,000. Exhibits fourteen through nineteen showed joint assets of both defendants; The Bond Fund of America, Washington Mutual Investors Fund, and The Income Fund of America for the periods January 9, 1994 through December 29, 1995. The defendant, Walter Schlichting, testified that Rose owns the property on West Main Street, Waterbury, Connecticut and has no other assets. He retired from IBM after twenty-five years service in September, 1993, at which time he started a consulting business. Finally, he testified the shares of the funds which they owned were sold about four weeks prior to the prejudgment remedy hearing, and the moneys were transferred to a Swiss bank account. He stated that this transfer was done because the DOW had dropped seven hundred points and it was a good time to sell the fund shares.

*2 In *First Constitution Bank v. Masotta,* Superior Court, judicial district of New Haven at New Haven, Docket No. 336859, 7 CONN. L. RPTR. 440 (September 28, 1992) (Vertefeuille, J.), involved a case where the debtors conveyed their home to their daughters on November 29, 1991. On September 10, 1991, the defendants had signed a promissory note payable to the plaintiff which was due and payable in full on December 9, 1991. In *First Constitution,* the defendants disputed the threshold issue of whether the plaintiff is a creditor who can challenge the conveyance of the home made on November 29, 1991. The court, in granting the prejudgment remedy application, stated: "Section 5(a) of the Act states that a transfer is fraudulent as to a creditor if the creditor's claim arose before the transfer was made ..." (Internal quotation marks omitted.) *Id.* In *First Constitution,* the defendants argued that because the note in question did not mature until December 9, 1991, the plaintiff did not become a creditor of the defendants until December 9, several days after the transfer of the home. In the instant case, the defendants also

argue that since the transfer to the wife took place in 1993, and the defendant, Walter Schlichting, did not default on the guarantee and note payments until 1995, the defendant debtor was not insolvent at the time of the real estate transfer and he was simply complying with advice of counsel.

The defendants point out that after the transfer of real estate, the defendant, Walter Schlichting's financial position was solid, especially relying on the fact that payments on the note were made for two years after the transfer. The court, accordingly, finds the defendant, Walter Schlichting, was able to pay his debts on October 22, 1993. Insolvency is a badge of fraud as spelled out in the Act. Insolvency is only one of several factors that the court must consider when viewing a claim of intentional fraudulent transfer. Based on the criteria set forth in *Molitor v. Molitor,* 184 Conn. 530, 536, 440 A.2d 215, which stated: "[a] conveyance is fraudulent if made with actual intent to avoid any debt or duty or if made without any substantial consideration by a person who is or will be thereby rendered insolvent ... A person is insolvent for these purposes when he is unable to pay his then-existing debts." (Citations omitted.) This court finds that the defendants here had an income in the year 1993 of $172,876 and that the note to the plaintiff's bank was paid for nearly two years after the claimed fraudulent transfer. This court finds that he was able to make regular payments on this debt and his ability to make future payments at the time of the transfer was not impaired. Accordingly, a fraudulent transfer is a question of fact, and fraudulent intent must be proved by clear, precise and unequivocal evidence. *Tyers v. Coma,* 214 Conn. 8, 11, 570 A.2d 186. "This standard of proof applies to intra-familial conveyances." *Id.* The plaintiff's proof has not risen to the level of clear, precise and unequivocal evidence. Accordingly, the plaintiff's application to set aside the transfer of the real property at 102 Holmes Road, Ridgefield is denied.

*3 With respect to the mutual funds, the court at the hearing ordered the defendants to make no further

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1997 WL 325393 (Conn.Super.)
(Cite as: 1997 WL 325393 (Co      Super.))

transfer pending a decision of this court. The court intends to find the transfer of these funds was fraudulent since the transfer to a Swiss bank had the effect to hinder, delay or defraud the creditor bank. The court makes no decision at this time and orders the parties to appear for a further hearing limited to the issue of whether the funds in the Swiss bank account(s) can be attached and/or ordered returned to this state. The temporary restraining order remains in effect.

Conn.Super.,1997.
Bank of Boston Connecticut v. Schlichting
Not Reported in A.2d, 1997 WL 325393
(Conn.Super.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 139461 (Conn.Super.)
(Cite as: 1995 WL 139461 (Conn.Super.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut, Judicial District of
Waterbury.
Judith SALAMONE
v.
DVR DIRECT INC. et al.
No. 0125375.

March 23, 1995.

*MEMORANDUM OF DECISION*

FLYNN, Judge.

**\*1** Before the court is a jurisdictional challenge
which hinges on where the principal office of a cor-
poration is located.

Those who founded the American Stock Exchange,
first traded on the curb of a New York Street. At
one time Lincoln was said to have kept his office in
his hat. Like the early premises of the "curb ex-
change" and Lincoln's business premises, the cor-
porate offices of DVR Direct are spartan. Presum-
ably Lincoln's office hat was nearby at all times he
did business. In that proximity particular, the de-
fendant corporation ceases to be Lincolnesque.

Although the defendant DVR Corporation has a
rented post office box in a mail drop in Seymour,
its office is not really there. Most of its substantial
business is conducted from a Southbury condomini-
um occupied by its agent for service of process and
a home in Texas.

After an ex parte hearing, the court (Sullivan, J.)
granted the plaintiff's application for a temporary
restraining order ("TRO") enjoining the defendant
Linda Buonocore from disposing or expending vari-

ous funds claimed to be the property of the defend-
ant corporation, DVR Direct, Inc. Defendant
Buonocore filed an objection to the TRO and mo-
tion to dismiss for lack of subject matter jurisdic-
tion. The basis of jurisdictional issue in both the
objection and the motion to dismiss is that the
plaintiff's underlying action is one to wind-up the
affairs of the corporation pursuant to General Stat-
utes § 33-382. The defendant argues that because
the corporation lists a Seymour address as its prin-
cipal office in the certificate of incorporation and
biennial reports, General Statutes § 33-382(a) & (b)
requires the dissolution action to be brought in the
judicial district of Ansonia-Milford which serves
Seymour. Therefore, the defendant argues that the
court does not have jurisdiction to grant the pre-
judgment remedy.

"A motion to dismiss tests, inter alia, whether on
the face of the record, the court is without jurisdic-
tion." *Upson v. State*, 190 Conn. 622, 624, 461
A.2d 991 (1983). "[A]s soon as the jurisdiction of
the court to decide an issue is called into question,
all other action in the case must come to a halt until
such a determination is made." *Gurliacci v. Mayer*,
218 Conn. 531, 544-45, 490 A.2d 509 (1991).

The issue before the court is whether this action to
wind-up the affairs of the corporation is properly
returnable to the judicial district of Waterbury. As
noted, the plaintiff brings this action pursuant to
General Statutes § 33-382(b), which provides that

[t]he superior court for the judicial district where
the principal office of a corporation is located, or
any judge thereof, may wind up the business and
affairs of such corporation on petition....

General Statutes § 33-284(4) defines the term
"principal office" as
the address of the principal office of such corpora-
tion in this state, if any, as the same appears in the
last annual report, if any, filed by such corporation
with the secretary of the state. If no principal office

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1995 WL 139461 (Conn.Super.)
(Cite as: 1995 WL 139461 (Conn. Super.))

so appears, the corporation's "principal office" means the address in this state of the corporation's statutory agent for service as last shown on the records of the secretary of the state....

*2 However, General Statutes § 33-284(a) d efines the term "address" to mean

location as described by the full street number, if any, street, city or town, state or country *and not a mailing address such as a post office box.*

(Emphasis added.) The credible evidence submitted by the plaintiff indicates that the address listed on the certificate of incorporation and the biennial report as the principal office of the corporation, 2 Klarides Village Drive, Suite 261, Seymour, CT, is the location of a business known as Mail Box, Etc. located in a shopping center. This location is a mail drop for the corporation. Other than receiving mail and an occasional fax for the corporation, no business of the corporation is conducted there. The premises is not only known as "Mail Boxes Etc." but a sign in the window indicates it has a "Mail Box Rental". The actual Connecticut corporate principal place of business is in the Southbury home of the defendant, Linda Buonocore. Furthermore, the court takes judicial notice that on the corporation letterheads in evidence, although the company lists its address in Seymour, its phone is in the Southbury exchange. Linda Buonocore is agent for service of process and lives in Southbury. Accordingly, the court finds that Suite 261, Klarides Village Drive, Seymour, CT, is "a mailing address such as a post office box." General Statutes § 33-284(a). The Seymour address listed on the certificate of incorporation and the biennial report does not constitute an "address" for the purposes of General Statutes § 33-284(a) & (r). General Statutes § 33-284(r) provides that

[i]f no principal office so appears [in the last annual report], the corporation's "principal office" means the address in this state of the corporation's statutory agent for service as last shown on the records of the secretary of the state.

In the present case, the statutory agent for service

listed on the certificate of incorporation is the defendant Linda Buonocore. In the current biennial report filed with the secretary of the state, her address is listed at 31 Farview Commons, Southbury, CT. (Defendant's Exhibit 2, dated March 15, 1995.) Based on her admission in testimony, the court finds she resides in Southbury now. Because (1) the defendant Buonocore resides in Southbury; (2) the real principal office is in Southbury; and (3) the Seymour office is but a post office box mail drop, the action is properly brought in the Judicial District of Waterbury. See General Statutes § 51-345(3)(D). ("If either the plaintiff or the defendant resides in the town of Southbury, the action may be made returnable at the option of the plaintiff to either the judicial district of Ansonia-Milford or the judicial district of Waterbury."); see also General Statutes § 51-344(12) ("The judicial district of Waterbury, consisting of the towns of ... Southbury, [etc.]").

The court finds that there was jurisdiction in the court to permit the court to hear and determine the issue and there was jurisdiction for the plaintiff to have brought the matter to the Superior Court at Waterbury initially before Judge Sullivan. The jurisdictional challenge is denied.

Conn.Super.,1995.
Salamone v. DVR Direct Inc.
Not Reported in A.2d, 1995 WL 139461 (Conn.Super.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

```
RETURN DATE:                          :    SUPERIOR COURT
                                      :
                                      :    JUDICIAL DISTRICT
GENERAL MARITIME CORPORATION          :    OF ANSONIA-MILFORD
                                      :    AT MILFORD
v.                                    :
                                      :
AIRCRAFT GUARANTY TITLE & TRUST,      :
LLC, in its capacity as TRUSTEE       :
of CONTINENT AIRCRAFT TRUST           :
NO. 461, and CONTINENT AIRCRAFT       :
TRUST NO. 461                         :    JULY 13, 2009
```

## COMPLAINT

**TO ANY PROPER OFFICER:**

BY AUTHORITY OF THE STATE OF CONNECTICUT, you are hereby commanded to attach and/or garnish to the value of $1,000,000.00 the goods or estate of **AIRCRAFT GUARANTY TITLE & TRUST, LLC**, in its capacity as Trustee of Continent Aircraft Trust No. 461, of 515 North Sam Houston Parkway East, Suite 305, Houston, Texas  77060, and **CONTINENT AIRCRAFT TRUST NO. 461** of 515 North Sam Houston Parkway East, Suite 305, Houston, Texas  77060; to secure such sum and to summon said Defendants to appear before the SUPERIOR COURT for the JUDICIAL DISTRICT OF ANSONIA/MILFORD AT MILFORD, to be held at 14 West River Street, Milford, Connecticut  06460 on _____, 2009 said appearance to be made by said Defendants or their attorneys by

filing a written statement of appearance with the Clerk of said Court on or before the second day following said return date, then and there to answer unto General Maritime Corporation in a civil action wherein the Plaintiff complains and says:

COUNT ONE:   BREACH OF LEASE AGREEMENT

1.     The Plaintiff, General Maritime Corporation, is a Marshall Islands corporation with its principal place of business located at 35 West 56th Street, New York, New York  10019.

2.     Upon information and belief, the Defendant Aircraft Guaranty Title & Trust, LLC ("Aircraft Title & Trust"), sued herein in its capacity as Trustee of the Continent Aircraft Trust No. 461 (the "Continent Aircraft Trust"), is a Delaware limited liability company with its principal place of business located at 515 North Sam Houston Parkway East, Suite 305, Houston, Texas  77060.

3.     Upon information and belief, the Defendant Continent Aircraft Trust is a Delaware statutory trust with its principal place of business located at 515 North Sam Houston Parkway East, Suite 305, Houston, Texas  77060.

-2-

4.   On or about January 7, 2004, Aircraft Guaranty Financial
Corporation ("Aircraft Financial"), a Nevada corporation, as Grantor,
and the Defendant Aircraft Title & Trust, as Trustee, entered into a
Declaration of Trust which created the Defendant Continent Aircraft
Trust.   Pursuant to said Declaration, Aircraft Financial appointed
Aircraft Title & Trust as Trustee of the Trust.

5.   Upon information and belief, pursuant to the Declaration of
Trust, Aircraft Financial and/or Aircraft Title & Trust caused that
certain Dassault Falcon 2000EX, serial number 15, FAA registration
mark N97GM (formerly N215EX), including its two (2) Pratt & Whitney PW
308C engines, serial numbers PCE-CF0042 and PCE-CF0025, together with
all parts, additions, accessories, and components installed thereon,
and including all radios, avionics and additional equipment
appurtenant thereto, and all available log books, manuals, maintenance
records and technical records (collectively the "Aircraft") to be
contributed to the Continent Aircraft Trust as Trust Property.
Pursuant to said Declaration, Aircraft Title & Trust holds legal title
to all Trust Property, including but not limited to the Aircraft.
Aircraft Title & Trust, in its capacity as Trustee of the Continent
Aircraft Trust, is listed as the registered owner of the Aircraft on

-3-

the records maintained by the Federal Aviation Administration (the "FAA Registry").

6.    On or about February 5, 2004, the Plaintiff as Lessee and the Continent Aircraft Trust as Lessor entered into an Aircraft Lease Agreement (the "Lease Agreement"). Said Lease Agreement was executed by Aircraft Title & Trust in its capacity as Trustee of the Continent Aircraft Trust.

7.    Pursuant to Section 1 of the Lease Agreement, the defendant Continent Aircraft Trust leased the Aircraft to the Plaintiff.

8.    Pursuant to Section 2 of the Lease Agreement, the Lease Agreement was to run for a term of five years commencing on February 5, 2004 and expiring on February 5, 2009.

9.    Pursuant to Section 4 of the Lease Agreement, the Plaintiff paid Continent Aircraft the amount of $125,000 per month as rent.

10.    Pursuant to Section 5 of the Lease Agreement, the Plaintiff was required to base the Aircraft at the Waterbury-Oxford Airport in Oxford, Connecticut (the "Airport").

11.    Pursuant to Section 6 of the Lease Agreement, the Plaintiff was required to return the Aircraft upon expiration of the Lease.

12.   Pursuant to Section 18 of the Lease Agreement, upon execution of the Lease Agreement, the Plaintiff deposited with the Continent Aircraft Trust $1,000,000 to be held by the Continent Aircraft Trust as security for Plaintiff's performance of its obligations under the Lease Agreement (the "Security Deposit").

13.   Further pursuant to Section 18 of the Lease Agreement, the Security Deposit was to be returned to the Plaintiff "forthwith" upon termination of the Lease Agreement.

14.   On or about February 5, 2004, the Plaintiff took possession of the Aircraft.

15.   On or about February 5, 2009, the Plaintiff returned the Aircraft to the Defendants at the Airport pursuant to Section 6 of the Lease Agreement, having complied with all of the redelivery provisions of the Lease Agreement.

16.   The Defendants have subsequently failed and refused to return the Security Deposit to the Plaintiff despite due demand.

17.   Accordingly, the Defendants have breached the Lease Agreement.

18.   The Plaintiff has been damaged thereby.

-5-

**COUNT TWO:   UNJUST ENRICHMENT**

1-18.   The allegations of paragraphs 1 through 18 of Count One are hereby incorporated by reference and realleged as Paragraphs 1 through 18 of Count Two.

19.   The Defendants received a benefit from receiving the Security Deposit from the Plaintiff.

20.   The Defendants unjustly failed to return the Security Deposit to the Plaintiff.

21.   Said failure of payment was to the Plaintiff's detriment.

**COUNT THREE:   VIOLATION OF CUTPA**

1-18.   The allegations of paragraphs 1 through 18 of Count One are hereby incorporated by reference and realleged as Paragraphs 1 through 18 of Count Three.

19-21.   The allegations of paragraphs 19 through 21 of Count Two are hereby incorporated by reference and realleged as Paragraphs 19 through 21 of Count Three.

22.   The Defendants are "persons" as defined by *Conn. Gen. Stat.* § 42-110a(3).

-6-

23.   The foregoing actions of the Defendants constitute the conduct of trade or commerce pursuant to *Conn. Gen. Stat.* §§ 42-110a(4) and 42-110b(a).

24.   The foregoing actions of the Defendants are immoral, unethical, oppressive and/or unscrupulous, and have caused substantial injury to the Plaintiff.

25.   The foregoing actions of the Defendants constitute unfair and/or deceptive trade practices in violation of *Conn. Gen. Stat.* § 42-110a *et seq.*

-7-

WHEREFORE, the Plaintiff claims:

1.    Money damages;

2.    Attorney's fees, costs and punitive damages pursuant to *Conn. Gen. Stat.* §§ 42a-110a, *et seq.*;

3.    Interest;

4.    An injunction prohibiting the Defendants from removing the Aircraft from the Airport or from selling, transferring, assigning, encumbering, deregistering, exporting, or cancelling the registration on the FAA Registry of the Aircraft;

5.    An injunction prohibiting the Defendants from selling, transferring, assigning or encumbering the Security Deposit; and

6.    Such other and further relief in law or equity as the Court may deem just and proper.

                              PLAINTIFF


                         By_____
                           Andrew B. Nevas
                           LEVETT ROCKWOOD P.C.
                           33 Riverside Avenue
                           P.O. Box 5116
                           Westport, CT  06881
                           Telephone:  (203) 222-0885
                           Facsimile:  (203) 226-8025
                           Juris No. 101078


                              -8-

RETURN DATE:                          :      SUPERIOR COURT
                                      :
                                      :      JUDICIAL DISTRICT
GENERAL MARITIME CORPORATION          :      OF ANSONIA-MILFORD
                                      :      AT MILFORD
v.                                    :
                                      :
AIRCRAFT GUARANTY TITLE & TRUST,      :
LLC, in its capacity as TRUSTEE       :
of CONTINENT AIRCRAFT TRUST           :
NO. 461, and CONTINENT AIRCRAFT       :
TRUST NO. 461                         :      JULY 13, 2009


### STATEMENT OF AMOUNT IN DEMAND

The amount, legal interest or property in demand is greater than $15,000, exclusive of interest and costs.

                                  PLAINTIFF,


                          By_____
                             Andrew B. Nevas
                             LEVETT ROCKWOOD P.C.
                             33 Riverside Avenue
                             P.O. Box 5116
                             Westport, CT  06881
                             Telephone:  (203) 222-0885
                             Facsimile:  (203) 226-8025
                             Juris No. 101078

173143(v.4)


-9-

RETURN DATE:                            :    SUPERIOR COURT
                                        :
                                        :    JUDICIAL DISTRICT
GENERAL MARITIME CORPORATION            :    OF ANSONIA-MILFORD
                                        :    AT MILFORD
v.                                      :
                                        :
AIRCRAFT GUARANTY TITLE & TRUST,        :
LLC, in its capacity as TRUSTEE         :
of CONTINENT AIRCRAFT TRUST             :
NO. 461, and CONTINENT AIRCRAFT         :
TRUST NO. 461                           :    JULY 13, 2009

## PLAINTIFF'S MOTION TO DISCLOSE PROPERTY

Pursuant to *Conn. Gen. Stat*. § 52-278n and Practice Book § 13-13, the Plaintiff hereby moves that the Defendants be ordered to disclose any and all property, real or personal, in which they have an interest, and any and all debts owing to them sufficient to satisfy a prejudgment remedy.  Specifically, the Plaintiff seeks an order requiring the Defendants to disclose the existence, location and extent of their interest in any and all such property or debts, including, but not limited to, the location of the $1,000,000 security

**ORAL ARGUMENT REQUESTED,**
**TESTIMONY REQUIRED**

deposit paid by the Plaintiff to the Defendants at the time the
Plaintiff leased the Aircraft which is the subject of the instant
action.

PLAINTIFF,

By _____
Andrew B. Nevas
LEVETT ROCKWOOD P.C.
33 Riverside Avenue
P.O. Box 5116
Westport, CT  06881
Telephone:  (203) 222-0885
Facsimile:  (203) 226-8025
Juris No. 101078

-2-

**ORDER**

The foregoing *Motion to Disclose Property*, having been duly presented to this Court, it is hereby ORDERED: **GRANTED/DENIED**.

It is further ORDERED that the Defendants submit, on or before _____, 2009, to the Court and to the attorney for the Plaintiff, a sworn statement setting forth any and all property, real or personal, in which the Defendants have an interest and any and all debts owing to the Defendants, including, but not limited to, the location of the $1,000,000 security deposit paid by the Plaintiff to the Defendants at the time the Plaintiff leased the Aircraft which is the subject of the instant action or, in the alternative,

That the Defendants appear before the undersigned at the Superior Court for the Judicial District of Ansonia/Milford at Milford, 14 West River Street, Milford, Connecticut, on _____, 2009 at

-3-

9:30 a.m., then and there to be examined under oath concerning any and all property, real and personal, in which they have an interest and any and all debts owing to them.

THE COURT

By _____
      Judge/Assistant Clerk

173840

-4-

RETURN DATE:                          :      SUPERIOR COURT
                                      :
                                      :      JUDICIAL DISTRICT
GENERAL MARITIME CORPORATION          :      OF ANSONIA-MILFORD
                                      :      AT MILFORD
v.                                    :
                                      :
AIRCRAFT GUARANTY TITLE & TRUST,      :
LLC, in its capacity as TRUSTEE       :
of CONTINENT AIRCRAFT TRUST           :
NO. 461, and CONTINENT AIRCRAFT       :
TRUST NO. 461                         :      JULY ____, 2009

### WRIT OF ATTACHMENT

TO ANY STATE MARSHAL OF THE COUNTY OF NEW HAVEN, HIS DEPUTY OR EITHER CONSTABLE OF THE TOWN OF OXFORD IN SAID COUNTY,

GREETING:

By authority of the State of Connecticut, you are hereby commanded, in accordance with the accompanying Order, to attach to the value of $1,000,000.00 the property, goods, or estate of Continent Aircraft Trust No. 461, a Delaware statutory trust with its principal place of business located at 515 North Sam Houston Parkway East, Suite 305, Houston, Texas 77060 and Aircraft Guaranty Title & Trust, LLC, a Delaware limited liability company with its principal place of business located at 515 North Sam Houston Parkway East, Suite 305, Houston, Texas 77060, specifically a) that certain Dassault Falcon 2000EX, serial number 15, FAA registration mark N97GM (formerly

N215EX), including its two (2) Pratt & Whitney PW 308C engines, serial numbers PCE-CF0042 and PCE-CF0025, together with all parts, additions, accessories, and components installed thereon, and including all radios, avionics and additional equipment appurtenant thereto, and all available log books, manuals, maintenance records and technical records (collectively the "Aircraft"), some or all of which are currently located at 9 Juliano Drive, Hangar G, the Waterbury-Oxford Airport, Oxford, Connecticut 06403; and b) the account(s) containing the $1,000,000 security deposit paid by the Plaintiff to the Defendants at the time the Plaintiff leased the Aircraft from the Defendants.

YOU ARE FURTHER COMMANDED to serve a true and attested copy of this Writ and Order Granting Application for Prejudgment Remedy upon the Defendants.

HEREOF FAIL NOT, but due service and return make.

Dated at Westport, Connecticut this _____ day of _____, 2009.

173161(v.3)

-2-

STATE OF CONNECTICUT}
                   } SS:  HARTFORD,   JULY 17, 2009
COUNTY OF HARTFORD  }

      Then and by virtue hereof, on the 17th day of July, 2009, I made due and legal service on the within named original Defendant, **AIRCRAFT GUARANTY TITLE & TRUST, LLC,** by leaving a verified true and attested copy of the original Notice Of Application For Prejudgment Remedy/Claim For Hearing To Contest Application Or Claim Exemption, Order Granting Plaintiff's Application For Temporary Restraining Order, Order For Hearing And Notice, Summons, Plaintiff's Application For Ex Parte Temporary Restraining Order, Plaintiff's Application For Prejudgment Remedy, unsigned Order Granting Plaintiff's Application For Prejudgment Remedy, Affidavit Of James M. Bergin In Support Of Plaintiff's Applications For Prejudgment Remedy And Ex Parte Preliminary Injunction, Exhibit, Affidavit Of James A. Calabrese In Support Of Plaintiff's Application For Prejudgment Remedy And Ex Parte Preliminary Injunction, Affidavit Of John Georgiopoulos In Support Of Plaintiff's Applications For Prejudgment Remedy And Ex Party Preliminary Injunction, Exhibit, Plaintiff's Memorandum Of Law In Support Of Applications For Prejudgment Remedy And Ex Parte Temporary Restraining Order, Exhibit, unsigned Complaint, unsigned Statement Of Amount In Demand, Plaintiff's Motion to Disclose Property, unsigned Order and Writ Of Attachment, with and in the hands of the clerk in charge of the office of Susan Bysiewicz, Secretary of State for the State of Connecticut. Said Secretary of State is the duly authorized agent to accept service for the within named Defendant, in the City of Hartford pursuant to C.G.S. 34-233(c), unauthorized foreign LLC

ATTEST:

ROLAND E. MAILLOUX
STATE MARSHAL
HARTFORD COUNTY